John E. CASTOR, et al.,
Petitioners, Appellants,

v.

CITY OF MINNEAPOLIS, Respondents.

No. C3–87–1036.

Supreme Court of Minnesota.

Sept. 23, 1988.

Bradley J. Gunn, Minneapolis, for appellants.

Robert J. Alfton, City Atty., Allen B. Hyatt, Asst. City Atty., Minneapolis, for respondents.

POPOVICH, Justice.

Petitioners John E. Castor, et al., (petitioners) sought an alternative writ of mandamus to compel condemnation proceedings by the City of Minneapolis (city), arising from the city's construction of an enclosed pedestrian "skyway" adjacent to petitioner's office building. The district court dismissed the petition, and the court of appeals affirmed, on the ground that any damage to petitioner's easements of light, view and air was not compensable because the elevated pedestrian walkway over a public alley constitutes a proper street use. We find the skyway in this case unreasonably impairs petitioners' easements, and therefore reverse.

I.

The facts are not in dispute. Petitioners own the Barristers Trust Building, a two-story office building in downtown Minneapolis. The building fronts on Third Avenue, and abuts a public alley that runs through the middle of the block between Third and Fourth Avenues. In or around 1983, the city constructed an elevated pe-

destrian walkway, or "skyway," above the alley. The skyway is a permanent enclosed structure that runs the entire length of petitioner's building, standing about four or five feet away. The skyway is about 14 feet wide and is built entirely over the 20–foot–wide public alley below. The supporting pillars of the skyway leave room for vehicles and foot traffic to pass through the alley. The skyway does not provide access to the Barristers Trust Building, by petitioners' choice.

The skyway was built to connect the Gateway Municipal Parking Ramp and Bus Layover Terminal, located between Fourth and Fifth Avenues, with the central skyway system through access to the Norwest Operations Center on Third Avenue. The record shows that the skyway system facilitates pedestrian access to various commercial and public buildings.

In 1986, petitioners filed an alternative writ of mandamus to compel initiation of condemnation proceedings. Their appraisal expert opined by affidavit that the skyway decreased the Barristers Trust Building's market value by approximately $70,000. After a mandamus hearing, the district court dismissed the petition with prejudice, finding the skyway a proper street use and any damages not compensable. The court of appeals, with one dissent, agreed. *Castor v. City of Minneapolis*, 415 N.W.2d 739 (Minn.App.1987). We granted review.

## II.

■ At the outset, the parties dispute the proper standard of review in this case. The facts, though, are undisputed, and the question presented is purely a question of law. When reviewing questions of law, this court gives no deference to the courts below. *See A.J. Chromy Const. Co. v. Commercial Mechanical Services, Inc.*, 260 N.W.2d 579, 582 (Minn.1977).

## III.

■ The issue before us is whether the city has potentially "taken" petitioners'

property without just compensation. As the city concedes, a landowner owning property abutting a public street possesses implied easements appurtenant to the lot for light, air, and view over the public street. *Haeussler v. Braun*, 314 N.W.2d 4, 7 (Minn.1981). The abutting landowner also possesses the same easement over a public alley. *See McCarthy v. City of Minneapolis*, 203 Minn. 427, 430, 281 N.W. 759, 761 (1938). These implied easements extend to the full width of the street and are independent of any fee interest in the street held by the landowner. *Haeussler*, 314 N.W.2d at 7. They are "property" within the meaning of Article 1, § 13, of the Minnesota Constitution.[1] *See Adams v. Chicago, Burlington & Northern Railway*, 39 Minn. 286, 290, 39 N.W. 629, 631 (1888).

The abutting owner's property interest is not absolute; it is qualified by and subservient to the public easement in the roadway. *Haeussler*, 314 N.W.2d at 7. But the public right, too, has limits. The public "cannot go beyond, but must be confined within, the general purpose for which the easement was granted * * *." *Cater v. Northwestern Telephone Exchange Co.*, 60 Minn. 539, 543, 63 N.W. 111, 112 (1895). When the light, air and view over a public street are obstructed by improper street uses, an additional servitude is deemed to be placed on the property owner's implied easements and a taking can be found. *Haeussler*, 314 N.W.2d at 8.

This court long ago recognized the impracticality of a universal test to determine what constitutes a proper street or highway use. In *Cater*, we resolved to "keep in mind the general purpose of highways, and adopt a gradual process of inclusion and exclusion as cases arise." *Cater*, 60 Minn. at 545, 63 N.W. at 113. The highway purpose is expansive, accommodating growth and change in transportation and the "transmission of intelligence." *Id.*; *Haeussler*, 314 N.W.2d at 7. Even innovative uses impose no additional servitude

---

1. Article 1, § 13, of the Minnesota Constitution provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation, therefor, first paid or secured."

*"provided* they are not inconsistent with the reasonably safe and practical use of the highway in other and usual and necessary modes, *and provided* they do not unreasonably impair the special easements of abutting owners in the street for purposes of access, light and air." *Cater,* 60 Minn. at 545, 63 N.W. at 113 (emphasis added). Thus, whether any given use is "proper"— in the sense that it works no taking of abutting landowners' rights—turns on the circumstance of each case.

The contested activity in *Cater* was construction of a telephone line along a rural highway, with poles at 170–foot intervals. This court found the line was "within the general purpose for which highways are designed," and it was "common knowledge" that such lines along a county road do not significantly interfere with either public travel or abutting landowners' easements. *Cater,* 60 Minn. at 545–46, 63 N.W. at 113. More recently, in *Haeussler,* we found that certain sound barriers built along an urban interstate highway imposed no additional servitude. While the approximately 20–foot tall barriers interfered with petitioners' property 53–55 feet away, we stressed that the barriers resulted from vehicular use of the highway and in fact were constructed pursuant to statutes governing traffic noise abatement. *Haeussler,* 314 N.W.2d at 8–9. Indeed, we observed, failure to build the barriers "might well result in a finding that the state has taken the abutting landowners' properties for a public purpose, the operation of a highway, by not checking the noise attributable to the highway." *Id* at 9.

On the other hand, a commercial railroad on a city street constituted a "perversion of the street to uses for which it was not intended * * *." *Adams v. Chicago, Burlington & Northern Railway,* 39 Minn. 286, 295, 39 N.W. 629, 634 (1888). As the *Cater* court later explained, the railroad subverted public use of the street and also unreasonably impaired the special easements of abutting owners. *Cater,* 60 Minn. at 545, 63 N.W. at 113.

The skyway in this case undoubtedly fulfills a legitimate public purpose. But to say the public benefits is not to say this unusual structure constitutes a proper street use. The block-long skyway runs the entire length of petitioners' building rather than simply across the alley. It stands four to five feet from the building and entirely obliterates the space above the alley, adjacent to petitioners' second-story windows. This is not, as telephone lines were in 1895, simply "a newly-discovered method of using the old public easement." *Cater,* 60 Minn. at 548, 63 N.W. at 114. We find something closer to appropriation of the alley, at petitioners' expense.

Nor is this particular skyway a logical and necessary outgrowth of the underlying public easement, as were the sound barriers in *Haeussler.* The alley in this case provides rear lot access through the center of the block. It is narrower than the surrounding streets and was obviously not meant to be used as a thoroughfare comparable to a street. The skyway appropriates alley space with an unrelated (albeit generally public) use. In so doing, it deprives the adjacent building occupants of air, light and view.

■ The critical question is not the public purpose involved or the city's entitlement to take petitioners' property, but whether that taking is compensable. The design and construction of this skyway creates an additional servitude beyond that imposed by the public easement inherent in the alley. We hold the skyway in this case is not a proper street or alley use, and petitioners are entitled to compel condemnation proceedings.

REVERSED.

SIMONETT and COYNE, JJ., concur specially.

WAHL, J., dissenting.

SIMONETT, Justice (concurring specially).

I join the court's opinion. I only wish to point out that this case does not involve a skyway that crosses a street at right angles, as a kind of elevated, enclosed bridge, which, to me, would seem to present a quite different situation. Skyways, per se, are not improper street uses. What is an improper street use depends, as the court

points out, on the circumstances of each case.

COYNE, Justice.

I join in Justice Simonett's special concurrence.

WAHL, Justice, dissenting.

I respectfully dissent. Under the law of this state and the facts of this case I find the public skyway above the public alley to be a proper street use which creates no additional servitude upon petitioners' implied easements for light, air and view. A taking can be found only where an additional servitude is placed upon this implied easement by an improper street use. *Haeussler v. Braun,* 314 N.W.2d 4, 8 (Minn.1981).

While the implied easements for light, air and view are a limited interest in property, possessed by the abutting landowners, they are, as the city notes, subservient to the public right to travel on the roadway, *Haeussler,* 314 N.W.2d at 7. They are subservient to the public easement in the roadway. In *Haeussler,* we stated:

> It is this public easement that defines, qualifies, and limits the implied easements for light, air, and view. *See Sauer v. New York,* 206 U.S. 536, 547–548, 27 S.Ct. 686, 689–90, 51 L.Ed. 1176 (1906).

*Id.* at 8.

For the past one hundred years we have taken a broad view of the public's easement. In 1895, Justice William Mitchell, looking down the future, stated, in resounding language, for the court:

> If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising [the public] easement is expansive, developing and growing as civilization advances.

*Cater v. Northwestern Telephone Exchange Co.,* 60 Minn. 539, 543, 63 N.W. 111, 112 (1895). The *Cater* court held that the construction of a, then new-fangled,

telephone line along the side of a rural highway did not impose an additional servitude upon the land but was within the public easement in the highway, a use within the general purpose for which highways are designed. Thus any damages sustained by the abutting landowners stemming from the erection and maintenance of the poles and wires in strict accordance with the requirements of the statute were not compensable. In discussing what might or might not be a legitimate "street or highway use," the court laid down this general rule:

> Whether it be travel, the transportation of persons and property, or the transmission of intelligence, and whether accomplished by old methods or by new ones, they are all included within the public "highway easement," and impose no additional servitude on the land, provided they are not inconsistent with the reasonably safe and practical use of the highway in other and usual and necessary modes, and provided they do not unreasonably impair the special easements of abutting owners in the street for purposes of access, light and air.

*Cater,* 60 Minn. at 545, 63 N.W. at 113.[1]

The *Cater* court was mindful, as we are mindful today, that a public use, however important, does not authorize the taking of private property without compensation unless that use also constitutes a proper use within the public easement in the highway or roadway. Nor should the burden of public improvements be shifted from the public and imposed upon any particular class of individuals such as abutting landowners unless those improvements are a proper use within the public highway easement and do not impose an additional servitude upon the land. We have also recognized, however, that if units of government were to be liable generally to property owners for diminution of value resulting

---

1. Other cases of this court expanding the concept of proper street use are *Willis v. City of Winona,* 59 Minn. 27, 60 N.W. 814 (1894) (construction of a bridge approach); *Ober v. City of Minneapolis,* 179 Minn. 495, 229 N.W. 794 (1930) (laying of sewer, gas and water lines); *McCarthy v. City of Minneapolis,* 203 Minn. 427, 281 N.W. 759 (1938) (construction of a bridge for street railway car service); *Minneapolis Gas Company v. Zimmerman,* 253 Minn. 164, 91 N.W.2d 642 (1958) (utility lines); *Haeussler v. Braun,* 314 N.W.2d 4 (1981) (sound barriers along a highway).

from exercise of their governmental powers, their functioning could be much impeded and in some cases prevented. *McCarthy v. City of Minneapolis*, 203 Minn. 427, 432, 281 N.W. 759, 762 (1938).

We have recently stated, in effect, that if a public use of a street is a proper street use, it does not impose an additional servitude:

> * * * any interference with the light, air, and view over a public street that results from the public's use of the street as a street, that is, from a proper street use, must be suffered by the abutting landowner without complaint to the courts. This is so because the implied easements do not entitle the landowner to every particle of sunlight or air that passes over the street. Rather, he is only entitled to the air, light, and view that are not obstructed by a proper street use.

*Haeussler*, 314 N.W.2d at 8. In *Haeussler* we held that construction of sound barriers along an interstate highway to reduce noise flowing from the interstate to adjacent neighborhoods was a proper street use and landowners living adjacent to the barriers, whose light, air and view over the highway were seriously obstructed by the barriers, were not entitled to compensation. In reaching this holding, we noted that although the presence of the sound barriers did not facilitate the movement of vehicles, they did result from vehicular use of the highway. *Id.* at 9.

Petitioners argue, primarily, that the construction and operation of the elevated walkway is not a proper street use because it is not a "proper alley use." An alley is not a street, they say, and because it is not, the skyway places an additional servitude on their easements of light, air and view.

We have recognized that alleys differ from streets in certain contexts. *See Flynn v. City of Worthington*, 177 Minn. 28, 224 N.W. 254 (1929) (assessment for improvements); *Winston v. Johnson*, 42 Minn. 398, 45 N.W. 958 (1890).[2] Nevertheless, even though alleys differ from streets in some respects, alleys, like streets, are public highways. Minn.Stat. §§ 221.011, subd. 5 (1986) and 160.29, subd. 1 (1986);[3] *See also State ex rel. Hunt v. City of Montevideo*, 142 Minn. 157, 171 N.W. 314 (1919). "It can hardly be questioned that the primary and fundamental purpose of a public highway, street or *alley* is to accommodate the public travel * * *." *Carli v. Stillwater Street Railway & Transfer Co.*, 28 Minn. 373, 376, 10 N.W. 205, 206 (1881) (emphasis added). The alley in this case is a public highway, accommodating public travel. As petitioners' counsel established in cross-examination of the city's witness, traffic engineer Gregory Finstad, cars and trucks drove freely through the alley before and after construction of the skyway; pedestrians walked freely through the alley before and after the construction of the skyway. That the city should choose to make it possible for those pedestrians to walk, safe from traffic and the weather, above the public alley, in an elevated walkway does not convert that walkway into an improper street use. And, as the *Cater* court said, "[I]t can make no difference in principle whether the immovable structure is on, under, or above the surface of the ground, for the rights of the owner of the fee are the same in either case." *Cater*, 60 Minn. at 546, 63 N.W. at 113. Just as telephones and telephone lines were a new invention in the 1880s, so skyways are a new creation in our day, a creation whose use, like the telephone, has been generally

---

2. Alleys are not so wide as streets but they intersect or open to a street, and while they are primarily used for ingress and egress or other convenience of abutting property owners, they are open to general vehicular traffic, though not designed primarily for such traffic. Minn.Stat. § 169.01, subd. 67 (1986). Alleys are also subject to speed zoning by local authorities, ordinarily 10 miles per hour. Minn.Stat. § 169.14, subd. 5c (1986); Minneapolis Code, § 474.460 (1976).

3. Minn.Stat. § 221.011, subd. 5 (1986) provides, " 'Public highway' means every public street, *alley*, road, highway or thoroughfare of any kind, except waterways, open to public travel and use." (Emphasis added). Minn.Stat. § 160.29, subd. 1 (1986) provides " * * * The term 'public way' means any highway, road, street, cartway, *alley* or lane or other publicly owned interest in real property which is open to the free passage and use of the public." (emphasis added).

acquiesced in by the public, "a popular verdict," in the words of *Cater*, "as to what public convenience requires, which courts can hardly afford to ignore." 60 Minn. at 547, 63 N.W. at 113–114.

The fact that the skyway does not possess all the attributes of a public highway is not fatal to a finding that the construction and operation of the skyway constitutes a proper street use. In *Cater*, we held that because public highways "are designed as avenues of communication," the maintenance of utility poles and telephone wires were within the public easement in the highway. 60 Minn. at 544, 63 N.W. at 112. I would find the skyway in question here no less consistent with the use and purpose of the roadway than were the telephone wires at issue in *Cater* and perhaps even more so. As the Court of Common Pleas of Ohio said, in a skyway case similar to this case,

> * * * the situation therefore differs not one whit from any other pedestrian bridge which carries pedestrians over the top of vehicular traffic. Certainly a pedestrian is no less a pedestrian when he walks within the confines of a public right of way whether he is above, below or beside other pedestrians or vehicles in the way.

*State ex rel. Cincinnati Garage Company v. Bird*, 25 Ohio Misc. 69, 263 N.E.2d 330, 333 (Court of Common Pleas of Ohio, 1970).

I would hold that the construction and operation of the elevated pedestrian walkway or skyway by the city over the public alley is a proper street use creating no additional servitude on petitioners' land which would constitute a taking. The trial court properly dismissed the petition with prejudice.